## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Banner Life Insurance Company,

    Plaintiff/Counter Defendant,

v.

Maxwell Bultman and Jake Lester,

    Defendants/Counter Claimants/
    Crossclaim Plaintiffs/Cross-Defendants,

v.

Andrea LiBrizzi,

    Defendant/Counter Claimant/
    Crossclaim Plaintiff/Cross-Defendant.

Civ. No. 22-605 (JWB/DLM)

**ORDER
ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

---

Joseph Robert Jeffery, Esq., and Kaitlyn Ellie Luther, Esq., Chittenden, Murday & Novotny LLC, and Adam S. Huhta, Esq., Huhta Law Firm, PLLC, counsel for Plaintiff/Counter Defendant.

Annaliisa Perrier Gifford, Esq., Elizabeth C. Henry, Esq., Francis J. Rondoni, Esq., and Jennifer J. Crancer, Esq., Chestnut Cambronne PA, counsel for Defendants/Counter Claimants Maxwell Bultman and Jake Lester.

Vytas M. Rimas, Esq., Rimas Law Firm, PLLC, counsel for Defendant/Counter Claimant Andrea LiBrizzi.

---

    This dispute is over competing claims to the proceeds of a life insurance policy held by John Bultman ("Mr. Bultman"), who died from cancer in June 2021. On one side are his sons Maxwell Bultman ("Max") and Jake Lester ("Jake"). On the other is his ex-domestic partner Andrea LiBrizzi ("LiBrizzi"). Both sides seek to be declared the

beneficiary to the policy's $250,000 payout. In the middle is the disinterested interpleading plaintiff, Banner Life Insurance Company ("Banner"), which seeks to be discharged from the matter and to have its attorneys' fees reimbursed.

For the reasons that follow, Banner will be discharged from this action, and a portion of its attorneys' fees will be reimbursed. On the cross-motions between the competing claimants, summary judgment will be granted for Max and Jake because the record lacks sufficient evidence to question whether Mr. Bultman validly changed his beneficiary designation in the weeks before he died.

## BACKGROUND

### I.    The Underlying Policy and Events Preceding Mr. Bultman's Death

#### A.    Mr. Bultman purchases the policy and names LiBrizzi the beneficiary

Nearly seven years before he died, Mr. Bultman opened a $250,000 life insurance policy with Banner in 2014. (*See generally* Doc. No. 1-1, Complaint ("Compl.") Ex. A.) As the policy owner, Mr. Bultman was given an online account with Banner that he could access with a username and password. Through the online account, he could submit documents related to his policy, including beneficiary change forms.

The policy initially listed LiBrizzi as the sole primary beneficiary and indicates that it was signed in Prior Lake, Minnesota. (*Id.* at 24–25, 28.) Mr. Bultman and LiBrizzi were not married but lived together in Minnesota before moving to Florida in 2016.

#### B.    Mr. Bultman is diagnosed with cancer; his relationship with LiBrizzi deteriorates

Mr. Bultman was diagnosed with cancer in 2016 and began receiving treatment.

2

Starting in late 2019, Mr. Bultman's sister, Jeanne Femrite ("Femrite"), and her husband began staying with the couple intermittently while Femrite, her husband, and Mr. Bultman worked on a nearby investment property that the trio had purchased together. According to LiBrizzi, Femrite's presence and involvement in Florida drove a wedge between the couple, which ultimately caused Mr. Bultman to move out of their shared home and into the investment property in July 2020.

Despite treatment, Mr. Bultman's cancer continued to progress and required surgery in September 2020. Before the surgery, Mr. Bultman assigned Femrite his power of attorney and health care directive and included her in his will. He did not change anything about his life insurance at that time. Following the operation, Femrite and other family members would take turns staying with Mr. Bultman at the investment property.

Meanwhile, Mr. Bultman and LiBrizzi's relationship soured to such an extent that Mr. Bultman initiated a court proceeding in the fall of 2020 over custody of the couple's dog Otis, which Mr. Bultman saw as rightfully his. LiBrizzi distanced herself from Mr. Bultman as the situation escalated, and Mr. Bultman later authored an online apology to LiBrizzi, calling her the girl of his dreams. After Mr. Bultman moved to the investment property, LiBrizzi saw him in person once in August 2020 and for the last time in December 2020.

The investment property sold the next spring, and Mr. Bultman began renting an apartment in March 2021. He began receiving palliative care visits at the apartment in April 2021. All the while, LiBrizzi remained the sole designated beneficiary on Mr. Bultman's life insurance policy, as she had been from the start.

3

### C.    Banner receives beneficiary change requests in mid-2021

The beneficiary designation appeared to change, however, on May 20, 2021, when a beneficiary change form bearing an electronic signature for "John David Bultman" was filed with Banner that named Mr. Bultman's son Max as the sole primary beneficiary. (Doc. No. 1-2, Compl. Ex. B.) The form listed Mr. Bultman's address as being the residence he had shared with LiBrizzi but had not lived at since August 2020. (*Id.*)

The same day, Mr. Bultman sent Jake (Max's older half-brother) the following text message:

> Hi Jake. What's your current address? I'm updating some of my insurance policies. I would rather have you on the policy rather [sic] than that woman who took my dog.

(Doc. No. 133-9.) Jake responded with his address, and two weeks later on June 3, 2021, a second beneficiary change form was filed with Banner, naming Max and Jake as primary beneficiaries, with Max to receive 75% of the proceeds and Jake to receive 25%. (Doc. No. 1-3, Compl. Ex. C, at 1.) The second change form again included the electronic "John David Bultman" signature but listed Mr. Bultman's apartment address. (*Id.* at 3.)

Medical notes from around that time report that Mr. Bultman remained alert and oriented, able to communicate and partially care for himself, and able to work on his computer, despite experiencing occasional pain, weakness, exhaustion, or confusion.

### D.    Mr. Bultman dies weeks later

Mr. Bultman's condition worsened in the few weeks that followed. The weekend after the second change form was submitted, Mr. Bultman's pain increased, and he was taken to the emergency room. Afterward, he consulted with his sister and decided that he

4

should move to hospice care. He was discharged from palliative care and referred for hospice care the following Monday, June 7.

Over the next week, Mr. Bultman and Femrite worked on updating his will but could not get it notarized before Mr. Bultman's cancer rendered him incapable of signing documents on June 14. He died in hospice the next week, on June 20, 2021.

## II.    Events Following Mr. Bultman's Death

### A.    Banner receives notice of Mr. Bultman's death; Femrite takes custody of his laptop

Banner first learned of Mr. Bultman's death a month later, on July 20, 2021, when Max called to notify the company. (Doc. No. 115-1 at 13.) Banner prepared a Notice of Claim memorializing the call and added it to Mr. Bultman's policy file. (*Id.* at 5.)

Around the same time in July, several of Mr. Bultman's family members went to his residence to pick up his ashes and collect his possessions, with Femrite serving as executor of the estate. Mr. Bultman's possessions included his laptop, which Femrite took back to her home in Minnesota—where Max had also been living in a basement apartment. Femrite kept the computer for the next year, until she recycled it with other electronics as part of moving to a new address. Before doing so, however, Femrite removed pictures and tax and business documents that were stored on the computer.

### B.    Banner declines to process beneficiary changes without additional information and opens an investigation

On July 28, 2021, Banner informed Max and Jake by letter that due to how close in time the beneficiary change form was submitted to Mr. Bultman's death, the company could not consider the recent submission naming them as beneficiaries without additional

documentation to confirm the submission's validity. (Doc. No. 115-1 at 15, 16.) Banner hired KAS*Per Resources Inc. ("KAS*Per") to investigate and report on whether the submitted change of beneficiary forms were acceptable.

As part of the investigation, KAS*Per contacted Jake, Femrite, and Mr. Bultman's palliative and hospice care providers. KAS*Per left messages with Max but did not speak with him. KAS*Per reviewed Mr. Bultman's treatment records from May 28, June 7, and June 8, 2021, and summarized them in its final report to Banner as follows:

- 5/28/21- Note from palliative care with no reference to mental status, but the Insured was communicating with the Staff.

- 6/7/21- Initial hospice visit with no reference to mental status.

- 6/8/21- Hospice note indicated Insured was forgetful. He was sleeping most of the time, but oriented to person, place and time.

(Doc. No. 118-1 at 3.) KAS*Per requested additional care records for dates between May 28 and June 6, but Mr. Bultman had no records of care visits during that period.

Banner updated Max, Jake, and LiBrizzi by letter on October 6, 2021, informing them that Banner had not made a final beneficiary determination, and that it would need to obtain medical records to verify that Mr. Bultman was mentally and physically able to make the June 3, 2021 beneficiary change. (Doc. No. 115-1 at 17–19.) Banner provided each of the three with forms to submit a claim to the insurance policy benefit. (*Id.*)

### C.    Jake, Max, and LiBrizzi each file a benefit claim

Over the course of the next eight days, Banner received claims from Jake, Max, and LiBrizzi. Jake submitted his claim on October 6, 2021 (Doc. No. 1-4, Compl. Ex. D.) Max submitted his on October 11, 2021 (Doc. No. 1-5, Compl. Ex. E.) And LiBrizzi filed

hers on October 14, 2021. (Doc. No. 1-6, Compl. Ex. F.)

On October 20, 2021, LiBrizzi emailed a Banner claims representative to request that the company "do a signature analysis," claiming that a "hospice caretaker" told her that Mr. Bultman had forms he was unable to sign around the beginning of June 2021. (Doc. No. 115-1 at 21.) LiBrizzi later testified that the "hospice caretaker" was not an employee of Mr. Bultman's provider but his ex-wife, who had been part of the rotation of family members staying with Mr. Bultman in his final weeks. (*See* Doc. No. 137-8, LiBrizzi Dep. at 97:13–98:4, 100:9–101:19.)

### D.    Banner gives the claimants time to resolve their competing claims

Faced with the competing claims and having no interest in which side would receive the funds, Banner granted Max, Jake, and LiBrizzi a period to negotiate how to distribute Mr. Bultman's policy proceeds. (Doc. No. 115-1 at 51–53.) If no agreement could be reached, Banner would file suit to have a court resolve the matter. (*Id.*)

## III.    Procedural History

### A.    Banner files interpleader and deposits funds

Having received no notice that the claimants had agreed on how to distribute the policy funds, Banner filed a Complaint for Interpleader under Rule 22 of the Federal Rules of Civil Procedure on March 8, 2022, naming Max, Jake, and LiBrizzi as Defendants. (Doc. No. 1.) Six days later, Banner moved to deposit the life insurance proceeds with the Court Registry. (Doc. No. 5.) Banner's motion went unopposed and was granted on March 23, 2022. (Doc. No. 7.) After discovering a mathematical error, Banner filed an amended deposit motion (Doc. No. 8), which was also unopposed and

granted on April 20, 2022. (Doc. No. 12.) Banner deposited the corrected proceeds amount of $256,517.89 with the Court Registry on May 3, 2022. (Doc. No. 13.)

### B.   Defendants file responsive pleadings

Max and Jake waived service of Banner's Complaint on April 18, 2022, acknowledging that they received waiver requests from Banner on March 14, 2022 (the day Banner filed its first motion to deposit the interpleaded funds). (Doc. Nos. 10, 11.) They filed their Answer on May 9, 2022, which included a combined counterclaim against Banner and crossclaim against LiBrizzi seeking to be declared the beneficiaries to Mr. Bultman's life insurance policy. (Doc. No. 15.)

LiBrizzi was served with Banner's Complaint on May 17, 2022. (Doc. No. 19.) She filed her Answer on June 7, 2022, which responded to both Banner's Complaint and Max and Jake's crossclaim and included her own counterclaim against Banner and crossclaims against Max and Jake. (Doc. No. 24.) In LiBrizzi's first count, she seeks to be declared the rightful policy beneficiary, and her second count claims tortious interference with expected inheritance against Max and Jake. (*Id.* at 19–21.)

### C.   Counter- and cross-defendants file responsive pleadings, discovery begins, and LiBrizzi tries to add Femrite to the case

Each party's final responsive pleadings were filed on June 8, June 21, and June 28, 2022. (Doc. Nos. 25, 28, 32.) The next year of proceedings included taking and disputing discovery, informal dispute resolution sessions, and attempts by LiBrizzi to add Femrite as a party to the case and to compel Femrite to produce documents. (*See* Doc. Nos. 43, 61, 96.) At the same time, Banner tried to facilitate an agreement with the Defendants to

discharge it from the litigation by stipulation, but LiBrizzi would not agree. After

LiBrizzi's motions regarding Femrite were ultimately denied (Doc. Nos. 86, 112), Banner

moved for summary judgment. (Doc. No. 113.)

## IV.     The Present Cross-Motions for Summary Judgment

Banner moves for summary judgment on its Complaint, seeking to be discharged

from the interpleader action and an award of its attorneys' fees. (Doc. No. 113.) LiBrizzi

opposes Banner's motion. (Doc. No. 117.) The sons do not oppose discharging Banner

and stipulated to dismiss their counterclaim for declaratory relief against Banner. (Doc.

No. 121.) The sons did not stipulate to awarding Banner its fees, however.

LiBrizzi moves for summary judgment on both her counterclaim against Banner

and her crossclaims against the sons. (Doc. No. 128.) The sons oppose LiBrizzi's motion

as it relates to her crossclaims against them and move for summary judgment in their

favor on their crossclaim against LiBrizzi. (Doc. No. 130.)

## DISCUSSION

## I.     Legal Standard

Summary judgment is proper if the record establishes that there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a). In order to determine which facts are material, courts should look to the

substantive law in a dispute and identify the facts which are critical to the outcome.

*Com. Union Ins. Co. v. Schmidt*, 967 F.2d 270, 272 (8th Cir. 1992) (citing *Anderson v.

Liberty Lobby*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists when

the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving

party. *Anderson*, 477 U.S. at 248. If the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party, then summary judgment is inappropriate. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

On summary judgment, evidence is considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). This means believing the nonmoving party's evidence and drawing all justifiable inferences in their favor. *See Schmidt*, 967 F.2d at 272 (citing *Anderson*, 477 U.S. at 255). Courts considering summary judgment do not weigh evidence to find the truth of the matter; the task is to decide whether a genuine trial issue exists. *See id.* (quoting *Anderson*, 477 U.S. at 249).

## II.   Analysis

Analysis of the parties' cross-motions will proceed as follows: first is Banner's request to be discharged from the matter; second is Banner's request for attorneys' fees; third is summary judgment as to Defendants' counterclaims against Banner; and last is summary judgment as to Defendants' crossclaims against each other.

### A.   Banner's request to be discharged

Interpleader allows a party holding money or property to bring a single suit joining individuals asserting exclusive claims to the fund, to protect against double liability and the burden of multiple lawsuits. *See Protective Life Ins. Co. v. Kridner*, Civ. No. 12-582 (JRT/JJG), 2013 WL 1249205, at *2 (D. Minn. Mar. 27, 2013) (quoting *Wittry v. Nw. Mut. Life Ins. Co.*, 727 F.Supp. 498, 499–500 (D. Minn. 1989)); *see also Dakota Livestock Co. v. Keim*, 552 F.2d 1302, 1306 (8th Cir. 1977). Interpleader is an equitable

action controlled by equitable principles. *Primerica Life Ins. Co. v. Woodall*, 975 F.3d 697, 699 (8th Cir. 2020) (quotation omitted). As such, if the interpleading party has acted unfairly to create the underlying conflict, then interpleader will not shield against counterclaims asserting that the party is at fault in creating the dispute. *See id.* at 700.

Here, the undisputed record shows that instead of processing Mr. Bultman's beneficiary change requests, Banner opted to investigate the validity of the submissions because they were made just weeks before Mr. Bultman died. Eight days after learning Mr. Bultman had died, Banner sent letters to Max and Jake explaining that it needed documentation to validate the submissions. Banner then hired a contractor who obtained access to medical records, reviewed the available records, and reported its findings.

In early October 2021, based on KAS*Per's investigative report, Banner informed the three potential beneficiaries that it still could not make a final determination and provided them the forms to submit benefit claims. Banner received claims from Max, Jake, and LiBrizzi shortly thereafter. Banner then sent notices to all three informing them of the competing claims and indicating that Banner would pursue an interpleader action if the three could not reach an agreement on how to distribute the funds. After receiving no notice of an agreement, Banner filed the interpleader action.

On its face, there appears to be nothing improper about how Banner proceeded in the months between receiving notice of Mr. Bultman's death and filing this interpleader action. However, LiBrizzi contends that Banner's failure to investigate the competing claims, undue delay in filing its Complaint, and unfair choice to file suit in Minnesota all support finding that Banner has operated unfairly in pursuing interpleader relief. Upon

11

review, each claimed unfairness falls short of invalidating Banner's use of interpleader.

### 1. Failure to investigate

LiBrizzi contends that Banner failed to fully investigate Mr. Bultman's capacity to sign the beneficiary change forms submitted in May and June 2021. Specifically, LiBrizzi faults Banner for not "following up" on her request to "do a signature analysis."

After submitting her benefit claim, LiBrizzi emailed Banner to advise that the company should analyze the electronic signatures on the beneficiary change forms because she had heard a comment from a "hospice caretaker" that made her question whether Mr. Bultman could have submitted the electronic documents himself—that is, whether he was *capable* of doing so. But LiBrizzi's email came two weeks *after* Banner had sent letters specifically explaining that it could not consider the beneficiary changes absent documentation establishing Mr. Bultman's capacity to make the proposed changes. And weeks before those letters, KAS*Per's initial September 17, 2021 report to Banner referenced Banner's "request to secure medical records in an attempt to determine whether the Insured was capable of making the Beneficiary change that was submitted to your company." (Doc. No. 118-1 at 1.) LiBrizzi's email did no more than raise an issue that Banner had already asked its contractor to investigate.

LiBrizzi's belief that signature analysis would have resolved the matter in her favor is not evidence that Banner's investigation was improper or insufficient. LiBrizzi's perceived investigatory shortcomings do not provide a reasonable basis to conclude that Banner's failure to conduct an unspecified signature analysis at LiBrizzi's request caused or contributed to the competing claims.

### 2. Unreasonable delay

LiBrizzi next contends that Banner unreasonably delayed initiating the interpleader lawsuit. She sets out the unduly delayed timeline as follows: Banner was notified on July 20, 2021 of Mr. Bultman's death; Banner sent letters giving notice of competing claims on October 22, 2021; and then Banner deposited the interpleader funds on May 3, 2022. She then declares nine months to be an unreasonable delay, without setting out what evidence shows *why* nine months is unreasonable in this case.

Banner, on the other hand, details how those nine months were spent: seeking access to medical records; awaiting its contractor's review of medical records once given access; notifying LiBrizzi and the sons of their competing claims; waiting to see whether the claimants would agree on how to apportion the funds; filing its interpleader lawsuit when no agreement materialized after four months; moving to deposit the funds six days after filing suit; and then later depositing the funds after correcting a calculation error.

To agree with LiBrizzi would require finding that nine months is an unreasonable delay in and of itself, not based on record evidence. Instead, the record establishes that the months between when Banner learned of Mr. Bultman's death and commenced the interpleader lawsuit were spent on necessary and proper efforts to investigate, confirm, and avoid liability on competing beneficiary claims.

### 3. Unfair venue

LiBrizzi's contention that Banner unfairly filed its lawsuit in Minnesota is futile. She cites no authority for her position that venue choice bears on whether an interpleader plaintiff unfairly contributed to the conflict between claimants. And even so, venue in an

interpleader action is proper in the judicial district where one or more claimants reside, 28 U.S.C. § 1397, and Max is an admitted Minnesota resident. (Doc. No. 15 ¶ 2.) As the plaintiff, Banner is free to file in a valid venue of its choosing.

### 4.   Conclusion on Banner's request to be discharged

LiBrizzi fails to establish a basis to deny Banner's request to be discharged from this interpleader action. Banner received the beneficiary change forms shortly before Mr. Bultman died, reviewed whether it could process the forms, determined that it could not, and then received claims from each potential beneficiary. On those facts, no reasonable jury could determine that *Banner* unfairly created the conflict that give rise to competing claims to the insurance proceeds. Therefore, Banner's motion for summary judgment is granted on this issue, and Banner is discharged from this matter.

### B.   Banner's request for attorneys' fees

As is common in interpleaded life insurance proceedings, Banner requests an award of its attorneys' fees upon being discharged from the matter. Banner requests not just its costs to prepare and initiate the interpleader lawsuit, but also its "substantial" fees from litigating against LiBrizzi's "unnecessary and unreasonable litigation positions" through discovery to the dispositive motion stage. (Doc. No. 114 at 5–6.)

Judge Tunheim's order on attorneys' fees in *Protective Life Ins. Co. v. Kridner*, Civ. No. 12-582 (JRT/JJG), 2013 WL 1249205 (D. Minn. Mar. 27, 2013), and its cited authorities, are particularly instructive and help guide the analysis of Banner's fee request here. Because Banner validly initiated the interpleader, its fees for that portion of the case will be awarded. However, an award that depletes the interpleader fund to cover the cost

14

of Banner's prolonged presence in the case would not be fair to the competing claimants.

**1.    Interpleading plaintiffs are generally awarded attorneys' fees, although some courts treat interpleader suits as an expected cost of the life insurance business**

A disinterested stakeholder who faces multiple liability and interpleads the claimants—like Banner did here—should not ordinarily bear the expenses incurred in bringing the action. *Kridner*, 2013 WL 1249205, at *2, n.4 (collecting cases). In part because claimants benefit from quickly resolving disputes over the claimed funds, courts often award fees and costs to the disinterested, interpleading insurance company. *See id.* (quoting *Allianz Life Ins. v. Agorio*, 852 F.Supp.2d 1163, 1168 (N.D. Cal. 2012)).

Some courts bar insurance companies from recovering costs and fees because filing interpleader actions to resolve competing beneficiary claims is a normal part of the life insurance business. *See id.* at *3 n.7. However, the Eighth Circuit has not wholly precluded fee awards to interpleading insurance companies on that basis. *See id.* (citing *N.Y. Life Ins. Co. v. Miller*, 139 F.2d 657, 658 (8th Cir. 1944); *Hunter v. Federal Life Ins. Co.*, 111 F.2d 551, 557 (1940)). Such a rule will not be applied here.

In addition, LiBrizzi's contention that Florida law and its rule barring recovery should govern here fails because the underlying life insurance policy contract—which includes the terms under which a beneficiary designation can be validly changed—was formed in Minnesota. Therefore, Minnesota law governs the policy, not Florida law.

**2.    Banner will be awarded modest fees and costs for initiating the interpleader action, but not for litigating subsequent discovery disputes and dispositive motion practice**

To recoup fees and costs, a court must find (1) a disinterested stakeholder, (2) who

has conceded liability, (3) has deposited the disputed funds into court, and (4) has sought discharge from liability. *Kridner*, 2013 WL 1249205, at *3 (quotation omitted). While a disinterested stakeholder usually recovers its costs and fees, the amount should be modest because interpleader actions do not typically demand great skill, labor, or responsibility. *See Federated Mut. Ins. Co. v. Moody Station & Grocery*, 821 F.3d 973, 979 (8th Cir. 2016) (quoting *Hunter v. Fed. Life Ins. Co.*, 111 F.2d 551, 557 (8th Cir. 1940)).

Banner plainly meets the four requirements for recovery, having been discharged from liability for the reasons provided in Section II.A. However, Banner will not be awarded costs and fees beyond those reasonably necessary to prepare and initiate the interpleader action. While Banner is correct that the timing of its effort to be discharged from this matter does not bear upon its *right* to recover its costs and fees, the timing does bear upon the *amount* of costs and fees it will recover.

### a. Banner is mistaken that it could not have sought discharge before summary judgment

Banner did not seek discharge from this matter for more than a year after depositing the interpleader funds. It argues that LiBrizzi's litigation positions prolonged its involvement, essentially contending that it could not have sought discharge before summary judgment. However, the record reveals both a behind-the-scenes effort by Banner to leave early in the case and missed opportunities to do the same by motion.

Banner circulated a proposed stipulation to discharge it from the case on August 11, 2022. As of that date, all parties had been served, all responsive pleadings had been filed, and the policy proceeds had been deposited. The groundwork was laid for

discharge, which Banner pursued by stipulation instead of through a potentially contested motion. When the stipulation effort failed because LiBrizzi declined to sign, Banner did not then seek discharge by motion but opted instead to await summary judgment.

At the very earliest, Banner could have sought discharge as part of a motion to deposit the interpleader funds filed after serving Defendants with its Complaint. The time to contest the propriety of the interpleader action is at the time the interpleader seeks to deposit the funds. *Cf. Kridner*, 2013 WL 1249205, at *3. LiBrizzi could not have contested Banner's use of interpleader when Banner sought to deposit the funds because Banner had not served her with its Complaint at that time. She was served on May 17, 2022—two weeks *after* the proceeds were deposited. Even though LiBrizzi's arguments about the propriety interpleader fail on their merits, she was precluded from making them against Banner's motion to deposit because of Banner's lack of service. By moving to deposit the funds well before completing initial service of the interpleader suit, Banner skipped an early opportunity to consider discharge.

Banner also argues that LiBrizzi's counterclaim required it to stay in the case through discovery. But the merits and impact of LiBrizzi's counterclaim could have been addressed sooner had Banner pursued discharge after receiving Defendants' responsive pleadings. Banner chose not to file a motion to dismiss what it believed to be a meritless counterclaim that stood in the way of its discharge from the action. Instead, Banner sought discharge by stipulation, which then broke down (in Banner's view) due to LiBrizzi's meritless counterclaim and related discovery requests. Banner later rejected LiBrizzi's offer to drop her counterclaim because she did not also offer to discharge

Banner and award its fees. (Doc. No. 114 at 23.) At least in part, Banner's actions

contributed to the reasons for pursuing discharge at summary judgment and not before.

> **b.     Banner will not automatically be awarded fees for defending a counterclaim that overlaps with the propriety of it seeking interpleader**

Banner quotes *Kridner*'s statement that "fees expended in responding to

counterclaims which essentially challenge only the propriety of an interpleader action are

recoverable by a stakeholder," 2013 WL 1249205, at *6, but that does not give Banner

license to litigate without abandon with the guarantee that it will be fully reimbursed.

Banner litigated against LiBrizzi's counterclaim as if it were an independent claim but

declined to take steps to defeat that claim earlier in the case.

Interpleading plaintiffs should be readily discharged unless there is a basis for

independent liability to a claimant. *See Metro. Life Ins. Co. v. Mitchell*, 966 F. Supp. 2d

97, 103 (E.D.N.Y. 2013) (quoting 4 James Wm. Moore et al., *Moore's Federal Practice*

§ 23.03[2][a] (3d ed. 2005)). Under the old interpleader practice, if a claimant alleged

independent liability, the stakeholder would lose its right to bring the interpleader action.

*Prudential Ins. Co. of Am. v. Hovis*, 553 F.3d 258, 264 (3d Cir. 2009) (citations omitted).

Today's practice is to keep the stakeholder in the litigation to defend the counterclaim,

even after depositing the disputed funds. *See id.* (citing *Wayzata Bank & Trust Co. v.*

*A & B Farms*, 855 F.2d 590, 593 (8th Cir. 1988)).

Upon inspection, LiBrizzi's counterclaim does not raise any legal issue other than

who should be entitled to life insurance proceeds—which is the dispute that the

interpleader action was brought to settle. LiBrizzi raised negligence in a single paragraph

affirmative defense and alleged that Banner failed to uphold its contractual obligation to pay LiBrizzi the policy proceeds. (Doc. No. 24 ¶¶ 31, 58–59.) Failing to choose between claimants rather than filing for interpleader cannot itself be a breach of a legal duty. *Hovis*, 553 F.3d at 266. LiBrizzi alleged no wrongdoing by Banner outside of its failure to choose her as the beneficiary. Therefore, she did not claim any basis for Banner to be independently liable to her.

Nonetheless, Banner treated LiBrizzi's filing like an independent claim. If Banner's position from the start was that LiBrizzi's claims had no merit and that discovery would not bear on the propriety of interpleader, Banner could have sought dismissal or early summary judgment and then requested discharge if successful. And even if LiBrizzi's claim could not have been defeated early on, potential independent liability would not bar a ruling on whether Banner properly filed for interpleader.

The mere presence of LiBrizzi's counterclaim does not automatically require awarding all of Banner's fees spent litigating the case through summary judgment. Banner's choice not to seek discharge until summary judgment is not a basis to award the fees it incurred by making that choice. Although Banner has acted in good faith throughout this litigation, its tactics and reasoning unnecessarily increased the overall amount of fees it now seeks to have reimbursed from the interpleaded funds.

### c.     LiBrizzi is incorrect that Banner would only be subject to discovery if it remained a named defendant

Banner is certainly not the only party that contributed to prolonging its presence in this litigation. LiBrizzi's failure to sufficiently allege a counterclaim that was

independent from Banner's failure to choose her as the rightful beneficiary led Banner in part to take its chosen litigation course. LiBrizzi also declined to cooperate with Banner's efforts to form an agreement discharging it from the case. LiBrizzi claims she kept Banner in the case because it would not have been subject to discovery otherwise. That belief is mistaken. Even as a nonparty, Banner could be compelled to sit for a deposition under Rule 30 and would remain subject to document subpoenas under Rule 34.

LiBrizzi's mistakes do not determine the issue, however. Whether Banner was a named party or not, LiBrizzi would still have pursued (in Banner's view, unreasonable) discovery, for which Banner would likely have incurred legal fees. The mere fact that Banner remained subject to LiBrizzi's discovery requests as a named party does not justify awarding its fees incurred in responding to her requests.

> **d.    Depleting the interpleader fund to cover costs of litigation between Banner and LiBrizzi would not be equitable**

Banner seeks to recoup all of its legal fees only from the interpleader fund, and not in part from LiBrizzi—the party whom Banner blames for its additional litigation costs. When pressed at oral argument, Banner declined to characterize any of LiBrizzi's positions or actions as being taken in bad faith, despite believing that certain of LiBrizzi's positions entirely lack legal merit. *Cf. Kridner*, 2013 WL 1249205, at *8–9 (discussing that a bad faith finding can justify awarding costs and fees from the losing claimant instead of from the interpleaded funds). That is Banner's choice. But Banner's decision to forego recovering fees from LiBrizzi is no reason to diminish the pool of funds that Banner itself acknowledges rightfully belongs to only either LiBrizzi or Max and Jake.

Diminishing the fund would be particularly unfair to Max and Jake because they demonstrated willingness to cooperate with Banner by stipulating to dismiss their counterclaims, and Banner provides no basis to question the fairness or legal merit of any of the sons' positions or tactics.

To be clear, even if certain litigation choices were based on a misunderstanding, limiting Banner's fee award is not a punishment for making those choices. Rather, as a matter of fairness, the most proportionate outcome is to award Banner's fees and costs related to filing the interpleader action—which was done fairly—but to exclude the fees and costs that it incurred thereafter.

### e.   Banner identifies $9,221.00 in fees and $641.58 in costs as attributable to filing the interpleader Complaint

Banner's first proposed stipulation to be discharged from this case in August 2022 included the following term:

> Awarding Banner Life its reasonable attorney's fees in the amount of $9,221.00 and costs in the amount of $641.58, *which were incurred in connection with prosecuting this Complaint for Interpleader*, with such fees and costs to be deducted from the amount deposited into the Registry of the Court[.]

(Doc. No. 115-2 at 16 (emphasis added).) Presumably, this is the amount of fees and costs attributable to initiating the interpleader suit. That amount is proportionate to Banner's efforts in bringing this matter from notice of death to deposited funds. Therefore, Banner is awarded $9,862.58 from the interpleaded funds.

Having addressed whether interpleader is appropriate and whether Banner should be discharged, it is necessary to evaluate the rights to the interpleaded fund. Those rights

are determined by resolving the Defendants' cross-motions for summary judgment.

### C.   Summary judgment on Defendants' counterclaims against Banner

LiBrizzi's counterclaim against Banner mirrors her complaints about whether Banner acted unfairly in bringing the interpleader lawsuit. She seeks to be declared the rightful beneficiary to Mr. Bultman's policy because Banner failed to sufficiently investigate and reject the sons' benefit claims. Her claim fails for the reasons given in Section II.A. Because there is no genuine issue of material fact as to Banner's alleged misconduct, and because the record supports finding Banner's conduct reasonable under the circumstances, Banner is entitled to summary judgment on LiBrizzi's counterclaim.

Max and Jake stipulated to dismiss their declaratory judgment counterclaim against Banner with prejudice. (Doc. No. 121.) That stipulation was accepted, and the claim was dismissed with prejudice by court order on July 19, 2023. (Doc. No. 123.) Max and Jake seek summary judgment only on their remaining crossclaim against LiBrizzi.

### D.   Summary judgment on Defendants' crossclaims

Cross-motions for summary judgment do not change the summary judgment standard. *Hanson v. Loparex, Inc.*, 809 F. Supp. 2d 972, 977 (D. Minn. 2011). To obtain summary judgment, the moving party must demonstrate an absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). If the moving party does so, the nonmoving party must raise more than a metaphysical doubt about material facts to establish a genuine fact issue. *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 910 (8th Cir. 2010) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Resting on allegations or denials in

a pleading is not enough—the nonmoving party must identify specific facts that show a genuine issue for trial. *Id.* (quoting *Matsushita*, 475 U.S. at 587).

When a party opposing summary judgment fails to show a genuine issue for trial, summary judgment "may and should be granted" if the moving party otherwise satisfies the summary judgment requirements. *Schmidt*, 967 F.2d at 272 (quoting *Celotex*, 477 U.S. at 323). The purpose of summary judgment is to isolate and dispose of factually unsupported claims and defenses. *See id.* (quoting *Celotex*, 477 U.S. at 327).

### 1.    Declaratory judgment as to policy beneficiary

Max and Jake seek summary judgment on their declaratory judgment crossclaim, arguing there is no reasonable dispute that the forms naming them as Mr. Bultman's beneficiaries are valid. LiBrizzi seeks summary judgment on her declaratory judgment crossclaim only as it relates to her argument that she was the intended beneficiary under Minnesota's "intent to benefit" test. She contends that material fact issues preclude summary judgment for either side on the questions of whether Mr. Bultman lacked capacity to submit the forms and whether the forms were the product of undue influence.

LiBrizzi also argues that the stipulated dismissal of the sons' counterclaim against Banner estops them from relitigating the same issue—whether they should be declared the rightful beneficiaries—in their crossclaim against her. The argument fails because the order accepting Max, Jake, and Banner's stipulated dismissal did not adjudicate all of the claims or rights and liabilities of all parties to the action—nor could it have. By rule, this action has not ended as to any of the claims or parties. Fed. R. Civ. P. 54(b). Accordingly, Max and Jake cannot *re*litigate an issue or claim for which the litigation has not ended,

and the summary judgment analysis of the crossclaims may proceed without issue.

In an interpleader action, questions of jurisdiction and procedure are determined by federal law, but the rights of parties bringing crossclaims are controlled by state law. *Coastal Air Lines v. Dockery*, 180 F.2d 874, 877 (8th Cir. 1950). Only Max and Jake brief the issue of whether to apply Minnesota or Florida law to analyze the crossclaims; LiBrizzi does not brief the issue but argues her "intent to benefit" theory under Minnesota law and her opposition to the sons' motion under Florida law.

The applicable law will be discussed in the analysis of each issue below. But regardless of which state supplies the law, summary judgment must be granted against a party who fails to sufficiently establish an essential element of their case for which that party bears the burden of proof. *See Celotex*, 477 U.S. at 322. On the record presented here, it is LiBrizzi who fails to make the requisite showing to survive summary judgment.

### a.       LiBrizzi's "intent to benefit" argument is misplaced

Even assuming Minnesota law applies for the sake of considering LiBrizzi's "intent to benefit" argument, the argument lacks merit. Under Minnesota law, a third party may recover as an intended beneficiary to a contract if they can show that the contracting parties intended to provide them a benefit through the contract. *See Kruger v. Lely North Am., Inc.*, 518 F. Supp. 3d 1281, 1289 (D. Minn. 2021) (citations omitted).

LiBrizzi's argument about Mr. Bultman's intent rests on a fundamental misunderstanding of the state of Mr. Bultman's beneficiary designation. Reiterated throughout her briefing, LiBrizzi surmises that because Banner did not process the beneficiary change forms, Banner rejected the submissions as not being in an acceptable

form as the policy requires and concluded that Mr. Bultman lacked capacity to make the changes or did not make the changes himself. (*See* Doc. No. 136 at 11; Doc. No. 139 at 18; Doc. No. 144 at 2–6.). This misconstrues Banner's response and the current disposition of the beneficiary designation.

Banner raised a concern over the *timing* of the submissions, not their form. After investigating because the requests were submitted just weeks before Mr. Bultman died, Banner still felt it could not decide whether to approve or reject the submissions and submitted the matter for resolution in court. Therefore, it is no surprise that LiBrizzi is still listed as the policy beneficiary. Banner never decided whether that should change. LiBrizzi painting the scenario as resolved in her favor is misplaced.

LiBrizzi's position that Mr. Bultman never wavered in his intent for her to benefit from the policy is refuted by clear record evidence—most notably the text message from Mr. Bultman to Jake stating that he was updating his insurance policies, and the two beneficiary change requests. For LiBrizzi to prevail on summary judgment, that evidence would have to be conclusively refuted. As explained above, her argument that Banner rejected the purported beneficiary changes misinterprets the record. Mr. Bultman's intent was *undetermined* at the time of his death due to the pending beneficiary changes.

Turning then to whether the change forms represent a change in Mr. Bultman's intent, LiBrizzi offers lack of capacity and undue influence as reasons to question the forms' validity. She contends that fact disputes preclude summary judgment on those issues. Max and Jake see no genuine fact issues and believe the record warrants entering judgment in their favor.

25

### b.   Lack of capacity

Both Minnesota and Florida recognize a presumption of competence. *See Jasperson v. Jacobson*, 27 N.W.2d 788, 792 (Minn. 1947); *Metropolitan Life Ins. Co. v. Taylor*, No. 3:11–cv–334–J–34JBT, 2012 WL 4356806, at *3 (M.D. Fla. Aug.14, 2012) (citation omitted). Both states also recognize that competence is measured at the time the document in question was executed, and that incompetence must be shown by something more than mental weakness. *See Sullivan v. Joint Indep. Consolid. Sch. Dist. No. 102*, 88 N.W.2d 1, 4–5 (Minn. 1958); *Timm v. Schneider*, 279 N.W. 754, 755 (Minn. 1938); *In re Seminole Walls & Ceilings, Corp.*, 355 B.R. 206, 232 (Bankr. M.D. Fla. 2007) (citation omitted). Mr. Bultman cannot be said to lack mental capacity where he could reasonably understand the nature and effect of his actions. *See Timm*, 279 N.W. at 755.

The party alleging lack of capacity must prove it by a preponderance of the evidence. *Metro. Life Ins. Co. v. Washington*, No. 8:14-CV-00886-T-24TB, 2015 WL 5125205, at *3 (M.D. Fla. Aug. 31, 2015) (citation omitted); *cf. Ivers v. CMFG Life Ins. Co.*, No. 15-CV-1577 (WMW/BRT), 2017 WL 8315859, at *9 (D. Minn. June 29, 2017) ("Because a party is presumed to possess the required capacity to contract, the burden of overcoming this presumption rests with the party asserting lack of capacity.").

LiBrizzi offers no direct evidence of Mr. Bultman's mental or physical state on May 20 or June 3, 2021. Instead, she collects pieces of evidence she believes are grounds to question Mr. Bultman's ability to request the beneficiary changes on either date. Specifically, she points out that the forms are electronically signed with Mr. Bultman's full name (which she says was not his custom), that the May 20 submission uses an

26

outdated address, that Mr. Bultman made errors on a May 29, 2021 disability benefits application, and that he grew too sick to sign documents by June 14. She then cites her own testimony explaining why those pieces of evidence indicate questionable capacity.

Competency or the lack thereof may be proven by circumstantial evidence. *See Krueger v. Zoch*, 173 N.W.2d 18, 21 (Minn. 1969). Indeed, any fact may be established by adequate circumstantial evidence. *Northern States Power Co. v. Lyon Food Products, Inc.*, 229 N.W.2d 521, 525 (Minn. 1975). However, circumstantial evidence is not adequate if it requires speculation to fill in evidentiary gaps. *Cf. Besett v. Hegg*, 890 F. Supp. 2d 1076, 1087 (D. Minn. 2012) ("Circumstantial evidence . . . cannot create a genuine issue of material fact if a key inference is left to conjecture and speculation.") (quotation omitted); *Hernandez v. Sam's E., Inc.*, No. 20-CV-61648-RAR, 2021 WL 1647887, at *6 (S.D. Fla. Apr. 26, 2021) (stating that circumstantial evidence does not adequately establish fact if it requires piling "inferences upon inferences").

LiBrizzi relies on her own assumptions and speculation to question mental capacity in the circumstances here. She questions why the beneficiary change forms were signed "John David Bultman" because Mr. Bultman's typical signature did not include his middle name. But the digital signature does match the full name listed for the Policy Owner in Banner's system. She similarly questions the use of an old address on the May 20 form. But Banner's corporate representative testified that the incorrect address on the May 20 form matched the address in Banner's system for Mr. Bultman on that date. Finally, checking the wrong box for whether Mr. Bultman was right- or left-handed on his disability benefits application form could simply be a typo on the otherwise error free

27

application. And listing only Max as his son on the form could be explained by the fact that Jake had been given up for adoption at a young age. Seeing mental decline as the cause of those mistakes is a pure guess.

The medical circumstances LiBrizzi points to also fall short of adequately combatting the presumption of competence. *Compare Schmidt*, 967 F.2d at 273 (affidavits from attending nurses stating that decedent was "confused, forgetful, unable to answer questions, mumbling to herself, and even incoherent in the days before the change of beneficiary form was executed" should have been found sufficient to raise a fact issue on capacity), *with Ivers*, 2017 WL 8315859, at *10 (circumstantial evidence did not overcome presumption of capacity to enter life insurance contract, even though decedent had physical and mental deficits, where decedent voiced clear preferences for his living and care arrangements), *and Am. Gen. Life Ins. Co. v. Schreiber*, 563 F. Supp. 2d 947, 949 (W.D. Wis. 2008) (evidence that decedent took psychotropic medication months before he changed his beneficiary, misstated how many times he had been married, tried to carry a gun on a bus, and could not identify the time of day did not establish lack of capacity to change life insurance beneficiary).

The nursing notes in the record indicate that Mr. Bultman was largely alert and oriented, although he experienced fatigue and confusion at times. Even viewing the notes in a light favorable to LiBrizzi, they do not raise a question over whether Mr. Bultman was so fatigued or confused on or around May 20 or June 3, 2021, that he could not understand he was submitting beneficiary change forms. LiBrizzi identifies no evidence to raise a fact issue over the nature and extent of Mr. Bultman's symptoms, or when

specifically he experienced them. And even assuming Mr. Bultman was fatigued or

confused on or around May 20 or June 3, there is no evidence showing the ailments

would have lasted for an extended duration.

LiBrizzi also does not raise a competency question from the evidence that

Mr. Bultman's pain grew so severe by June 14, 2021, that a social worker said he could

not legitimately sign an updated will. Medical notes from June 7 and 8 report

Mr. Bultman as being awake, alert, oriented to self, time, and place, having intact

judgment, and even working on his laptop, despite being bedbound and experiencing

bouts of pain and confusion. (*See* Doc. No. 115-1 at 34–35, 39–41, 45, 47–48.) A nursing

note from 11:50 a.m. on June 8 expressly indicates no cognitive impairment. (*Id.* at 47.)

The notes from Monday, June 7 indicate that the provider worked with Mr. Bultman over

the preceding weekend, which included him reporting his own symptoms, adamantly

declining an offer to go to the hospital but eventually seeking emergency room treatment

for a distended bladder, and electing to move to hospice after discussing it with his sister.

(*See id.* at 31.) Notes from May 28 describe Mr. Bultman as being pleasant, alert,

oriented, and cooperative. (*Id.* at 25–28.) Physically, he was able to shower, dress

himself, and walk without assistive devices, although he could not perform tasks

requiring a lot of energy. (*Id.*) Even though some medical notes document Mr. Bultman

experiencing bouts of confusion, fatigue, pain, and weakness (*see, e.g.*, *id.* at 25, 27, 31,

35), the notes from days before and after the June 3 beneficiary change submission show

he was otherwise awake, aware, and functional enough to discuss matters with his

medical providers and use his computer.

Although the law does not require LiBrizzi to offer independent medical evidence to raise a fact issue on lack of capacity, her failure to present any is especially glaring in light of medical records showing Mr. Bultman as being mostly alert and oriented, able to communicate with medical staff about his condition and symptoms, and somewhat capable of caring for himself and using his computer, up to and including the immediate days *after* the second beneficiary change form was submitted. The record shows his condition did not deteriorate to the point of incapacitation until June 14.

In the end, LiBrizzi's speculation and theories are not sufficient to create a fact issue over whether Mr. Bultman was capable of submitting the beneficiary change forms, even as his disease progressed. Combining the presumption of capacity with the medical records from the days surrounding the beneficiary change requests, a reasonable jury could find Mr. Bultman had capacity to submit the forms and rule for Max and Jake.

### c.   Undue influence

Under both Minnesota and Florida law, the party claiming undue influence has the burden to submit evidence sufficient to raise the presumption of undue influence. *See Washington*, 2015 WL 5125205, at *3 (citations omitted); *Norlander v. Cronk*, 221 N.W.2d 108, 111 (Minn. 1974). A presumption of undue influence arises when a beneficiary (1) had a confidential relationship with the decedent at the time the alleged influence occurred, and (2) actively procured the bequest. *Metro. Life Ins. Co. v. Carter*, No. 3:04-CV-668-J32HTS, 2005 WL 2810699, at *15 (M.D. Fla. Oct. 27, 2005) (citing *In re Estate of Stetzko*, 714 So.2d 1087, 1090 (Fla. 4th DCA 1998)). Active procurement warning signs include:

(1) the presence of the beneficiary at execution of the will;
(2) the presence of the beneficiary on those occasions when the testator expressed a desire to make a will;
(3) a recommendation by the beneficiary of an attorney to draw the will;
(4) knowledge of the contents of the will by the beneficiary prior to execution;
(5) giving of instruction on preparation of the will by the beneficiary to the attorney drawing the will;
(6) securing of witnesses to the will by the beneficiary; and
(7) safekeeping of the will by the beneficiary subsequent to execution.

*Washington*, 2015 WL 5125205, at *3 (citation omitted). Once the presumption is raised, the opposing party must establish the absence of undue influence by a preponderance. *Id.* LiBrizzi fails to identify sufficient record evidence to raise the presumption here.

Nothing on the face of the beneficiary change forms raises a reasonable question about undue influence. LiBrizzi's theorizing and supposition about the significance of an incorrect address and the use of Mr. Bultman's middle name in the digital signature are insufficient to challenge the facial validity of the forms. Her theorizing and supposition are not themselves evidence, and documents appearing valid on their face are presumed valid against questions of undue influence. *See Washington*, 2015 WL 5125205, at *3 (citation omitted). Similarly, LiBrizzi's concern that Mr. Bultman eventually was unable to sign documents is not evidence that he was vulnerable to undue influence in the preceding weeks. Evidence of confusion or memory problems in the last week of life is not evidence that such mental problems manifested earlier. *See Stetzko*, 714 So.2d at 1091. If anything, the record evidence from the dates surrounding the change form submissions reinforces their validity.

LiBrizzi also points out that Mr. Bultman did not change the life insurance at the

same time that he changed other legal documents in September 2020, that she was still listed as the policy beneficiary as of March 2021, that Mr. Bultman still loved her because he penned an extensive apology to her online in October 2020, and that he was trying to include her in a new will before he died. Those points show nothing about Mr. Bultman's thinking about life insurance on or around May 20 or June 3, 2021, much less whether he was subject to undue influence around that time. Events from more than half a year in the past say nothing about Mr. Bultman's intent months into the future. Femrite's presence at Mr. Bultman's residence during the time period that the change requests were submitted does not suggest undue influence—despite LiBrizzi's personal distrust of Femrite. LiBrizzi was listed as the policy beneficiary in March 2021 because no request to change the policy had been made. And attempting to include LiBrizzi in a will says nothing about whether Mr. Bultman changed his plans for the life insurance policy. Drawing an inference of undue influence from this evidence is speculative at best.

Instead, record evidence plainly undermines LiBrizzi's beliefs. Max and Jake both testified that they did not specifically know about the life insurance before Mr. Bultman died. (*See* Doc. No. 133-7, Maxwell Dep. at 38:12-14; 40:4-7; Doc. No. 133-8, Lester Dep. at 21:1-23.) The record also shows Mr. Bultman was a former Chief Information Officer and used his computer even up to the time that he was leaving palliative care and entering hospice, days *after* the change forms had been submitted. Femrite testified that Mr. Bultman gave her the information to access his laptop in June before she left for the last time before he died, but she did not take his computer until after he died. And even if Femrite had both the computer and its login credentials, there is no evidence she knew

Mr. Bultman's credentials to Banner's online portal.

The same day that the first beneficiary change form was submitted, Mr. Bultman messaged Jake an express statement that he was updating insurance policies and wanted Jake on the policy, not LiBrizzi. This explains why Jake did not appear on the first submission and why the changes were necessary: as of May 20, 2021, Mr. Bultman wanted to send the life insurance proceeds to his sons, not to LiBrizzi. It also shows Mr. Bultman initiating with Jake, not Jake actively procuring the change. If the record is clear about anything regarding Mr. Bultman's intent at the time of the beneficiary changes, it is that he no longer wished to send his life insurance proceeds to LiBrizzi.

In sum, LiBrizzi does not identify sufficient evidence to raise the presumption of undue influence, much less to support a jury finding in her favor.

### d.   Conclusion on declaratory judgment

LiBrizzi's representation that Banner rejected the beneficiary change requests is factually incorrect. The matter has been interpleaded for resolution in court. For LiBrizzi to be declared the policy beneficiary, the beneficiary change forms must be found invalid. And for Max and Jake to prevail, the June 3, 2021 change form must be found valid.

LiBrizzi does not point to sufficient evidence to create a fact issue over the forms' validity, either through lack of capacity or undue influence. She points to various pieces of evidence, but to find lack of capacity or undue influence from that evidence as she does requires speculation. At best, LiBrizzi's beliefs raise a metaphysical doubt, not a genuine issue of material fact, as to lack of capacity and undue influence.

Because Mr. Bultman is presumed to have had capacity to change his beneficiary

designation, because LiBrizzi has not provided enough evidence to raise a presumption of undue influence, and because record evidence provides support for a jury to find the presence of mental capacity and the absence of undue influence, the change forms are valid as a matter of law. Accordingly, Max and Jake's request for summary judgment on the crossclaims for declaratory judgment is granted, and LiBrizzi's request is denied.

### 2. Tortious interference with inheritance

LiBrizzi also moves for summary judgment on her crossclaim for tortious interference with inheritance against Max and Jake. Even granting LiBrizzi her choice of Florida law (where this claim is recognized), the claim still fails.

Tortious interference with an expectancy of inheritance includes these elements: (1) the existence of an expectancy; (2) intentional interference with the expectancy through tortious conduct; (3) causation; and (4) damages. *Schilling v. Herrera*, 952 So.2d 1231, 1234 (Fla. Dist. Ct. App. 2007) (citations omitted). Important to remember is that the tort is meant to protect the *testator* (Mr. Bultman), not the beneficiary (LiBrizzi). *See id.* (citation omitted). Accordingly, the tortious conduct must be directed at the testator. *See id.* (quoting *Whalen v. Prosser*, 719 So.2d 2, 6 (Fla. 2d DCA 1998)).

### a. LiBrizzi does not pursue the claim against Jake, and her claim against Max is too speculative to raise a fact issue

LiBrizzi contends she is entitled to judgment on tortious interference "based on the actions [of] Defendant Maxwell Bultman and his Aunt Jeanne Femrite under Florida law." (Doc. No. 136 at 11–12.) She does not argue that she is entitled to judgment based on any action by Jake, so at minimum her crossclaim fails as asserted against Jake.

LiBrizzi goes on to treat Max as a joint tortfeasor with Femrite, even though Femrite is not a named defendant. LiBrizzi lost her bid to file a complaint asserting tortious interference against Femrite because the allegations founded on LiBrizzi's "information and belief" were insufficient to plausibly state tortious conduct. (*See* Doc. No. 75 at 11–13.) Now at summary judgment, LiBrizzi does not offer sufficient evidence for her tortious interference theory to survive as a crossclaim against Max.

At times, LiBrizzi intimates that someone other than Mr. Bultman submitted the beneficiary changes. However, she points to no record evidence that Max or Femrite had the opportunity or capability to access Mr. Bultman's computer prior to his death generally, and not when the beneficiary change forms were submitted specifically—much less that either one knew Mr. Bultman's credentials to access Banner's online portal and submit the forms. Max testified that he first learned of the insurance policy after his father died and had not seen the beneficiary change request. (Maxwell Dep. at 111:9-12.) So did Femrite. (Doc. No. 137-8, Femrite Dep. at 20:14-25; 98:2-8; 136:16-138:14.) Femrite also expressly denied using her power of attorney to change insurance beneficiaries and denied that she and Mr. Bultman ever discussed making beneficiary changes. (*Id.* at 97:20-98:1.) LiBrizzi does not rebut this testimony with anything other than her own firmly held beliefs about foul play.

LiBrizzi admitted that her notion that someone other than Mr. Bultman submitted the forms was just that—a notion—and could not point to any evidence outside of her own suspicions to support it. Speculative beliefs do not create a genuine fact issue. *See Feinman v. Target Corp.*, No. 11-62480-CIV, 2012 WL 6061745, at *6 (S.D. Fla. Dec. 6,

2012) (quotation omitted). Additionally, to rule for LiBrizzi, a jury would have to find that Max (or Femrite with Max's cooperation) had the opportunity and the means to access not just Mr. Bultman's computer but also his password protected online account with Banner, all to change the terms of a life insurance policy Max did not know about until after his father died. The jury would also have to believe either that Mr. Bultman did not send the message telling Jake that he was changing insurance forms, or that Mr. Bultman was so sick that he did not understand the message—but not so sick that he could type and send it. Accordingly, like lack of capacity and undue influence, LiBrizzi's fraudulent submission theory is wholly speculative and not supported by sufficient record evidence to raise a fact issue, much less to award her summary judgment.

### b.  Recycling Mr. Bultman's computer is not evidence of a cover up

The critical act LiBrizzi believes signifies tortious interference is the "destruction" of Mr. Bultman's computer. She argues that Femrite and Max destroyed the computer, but there is no evidence other than LiBrizzi's say-so that Max was involved in recycling Mr. Bultman's computer. Femrite testified that *she* recycled the computer at the time that she was preparing to move to a new home. (Femrite Dep. at 34:24–35:13.) To attribute any misconduct related to recycling the computer to Max, one must believe that Max was involved in or knew about the act, with some intent to interfere with Mr. Bultman's wishes for LiBrizzi to inherit the life insurance proceeds.

LiBrizzi points to Max living in the basement apartment of Femrite's home as evidence that Max was involved with or aware of the decision to recycle the computer.

That is pure speculation. LiBrizzi failed to sufficiently allege tortious interference by Femrite, whom the evidence shows actually recycled the computer. LiBrizzi's effort to extend the alleged wrongdoing to Max and establish joint, cooperative tortious interference is rooted in the same information and belief that failed previously.

LiBrizzi likewise concludes without evidence that Mr. Bultman's computer held documents showing how he desired to distribute his property. Both Femrite and Max testified that documents were removed from the computer and have been produced in discovery. Max specifically testified that if a document was not included in the discovery production, then it was not on his father's computer. (Maxwell Dep. at 89:6-9.) LiBrizzi's speculation is insufficient to raise a fact question over the computer's contents.

Instead, LiBrizzi asks to draw a negative inference against Max and Femrite because destroying the computer violated a court order to preserve evidence. The relevant order did not include a wholesale directive to preserve any and all evidence under any and all circumstances, however. The applicable portion directs the parties to "use reasonable, good faith and proportional efforts to preserve, request, identify and produce relevant information." (Doc. No. 30 at 2.) Recycling the computer after first downloading documents and producing those documents in discovery is not indicative of an unreasonable, bad faith, or disproportionate effort to preserve relevant information.

LiBrizzi's claim ultimately fails because recycling the computer a year after Mr. Bultman died is not itself indicative of a cover up. Nor is the fact that Femrite and Max shared an address between 2020 and 2021. Mr. Bultman mistaking his dominant hand and reporting only Max as his son on a disability benefits application do not signify

some larger issue. Reports that Mr. Bultman was unable to sign forms days before he died do not raise a question over his capacity to do so when the beneficiary change forms were submitted weeks earlier. The full-name digital signatures on the forms matched the data in Banner's system, and an outdated address was updated on the same day that the last change form was submitted. None of these facts points to interference.

Aggregating the evidence fares no better. LiBrizzi attempts to string together a timeline under which Mr. Bultman's capacity was diminishing or diminished, and under which his sister and/or son conspired to fabricate the beneficiary changes and then destroy evidence of the truth a year later. LiBrizzi's speculative interpretation does not support an inference that the beneficiary changes were the result of Femrite and Max's meddling or did not align with Mr. Bultman's wishes. To view the record as LiBrizzi asks and find in her favor requires too great a leap and relies on too little record evidence.

### c.   Conclusion on tortious interference

On the record presented here, no reasonable jury could find that Mr. Bultman's sister and son surreptitiously submitted multiple beneficiary change requests or corruptly destroyed evidence, all to stop LiBrizzi from inheriting the life insurance proceeds. There is not sufficient evidence to justify such findings, even by inference. The only justifiable inferences to be drawn here are those of a man getting his affairs in order as he neared the end of his life, and then his next of kin managing his affairs in the weeks and months that followed. Therefore, LiBrizzi's tortious interference claim fails and is dismissed.

### 3.   Conclusion on crossclaims

Even taking LiBrizzi at her word and drawing all reasonable inferences in her

favor, her case amounts to no more than a metaphysical doubt about the validity of the beneficiary change forms. There is not sufficient record evidence to raise a genuine fact issue over Mr. Bultman's beneficiary changes. Rather, the record supports a finding of capacity, refutes the possibility of undue influence, and rules out tortious interference. Therefore, as a matter of law Max and Jake are the beneficiaries of Mr. Bultman's life insurance policy as reflected in the June 3, 2021 beneficiary change request. The policy proceeds will be disbursed in accordance with those terms, with Max receiving 75% and Jake receiving 25%.

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** as follows:

1.      Plaintiff Banner Life Insurance Company's Motion for Summary Judgment (Doc. No. 113.) is **GRANTED**, and Defendant Andrea LiBrizzi's counterclaim is **DISMISSED**. Plaintiff Banner Life Insurance Company is discharged from any further liability with respect to the funds deposited with the Clerk of Court and is **DISMISSED WITH PREJUDICE** from this matter.

2.      Plaintiff Banner Life Insurance Company's request for attorneys' fees is **GRANTED** as to its request for its fees and costs incurred in initiating this interpleader action, and the request is **DENIED** as to its request for its fees in litigating the counterclaims filed against Banner.

3.      Defendant Andrea LiBrizzi's Motion for Summary Judgment (Doc. No. 128) is **DENIED**.

4.      Defendants Maxwell Bultman and Jake Lester's Motion for Summary

Judgment (Doc. No. 130) is **GRANTED**, and Defendant Andrea LiBrizzi's crossclaims are **DISMISSED**.

5.     Defendants Maxwell Bultman and Jake Lester are the sole legal beneficiaries and rightful recipients of all proceeds of John Bultman's life insurance policy, Policy No. 180960285.

6.     The Clerk of Court is directed to disburse all funds deposited into the Registry of the Court pursuant to the April 20, 2022 Order (Doc. No. 12) as follows:

   a.     $9,862.58 to Plaintiff Banner Life Insurance Company for its reasonable attorney's fees and costs;

   b.     75% of the remainder to Defendant Maxwell Bultman; and

   c.     25% of the remainder to Defendant Jake Lester.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: January 8, 2024                          *s/ Jerry W. Blackwell*
                                               JERRY W. BLACKWELL
                                               United States District Judge